1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO. CR 02-00673 MMM |
| Plaintiff, ) | |
| ) | ORDER DENYING MOTION TO |
| vs. ) | DISMISS INDICTMENT |
| ) | |
| NATTY ASIEGBU, et al. ) | |
| Defendants. ) | |
| ) | |

On June 27, 2002, defendant Natty Asiegbu was indicted on charges of violating 18 U.S.C. § 1343, (wire fraud); 18 U.S.C. § 2326 (enhanced penalties for telemarketing fraud against the elderly); 18 U.S.C. § 1302 (mailing lottery tickets and related material); and 18 U.S.C. § 2 (aiding and abetting and causing an act to be done). In June 2004, the grand jury returned a first superseding indictment that included the charges outlined above and added new sentencing allegations.

Asiegbu has now moved to dismiss the indictment. He asserts that by arresting him three years after his indictment, the government has violated his Sixth Amendment right to a speedy trial.

# I.  FACTUAL BACKGROUND

## A.  Factual Allegations Underlying the Indictment

The charges against Asiegbu arose out of a joint investigation of fraudulent telemarketing businesses ("the Lottery Companies") by the Federal Bureau of Investigation, the Royal Canadian Mounted Police and the British Columbia Ministry of Attorney General.[1]  The government contends that, while working in Canada as a telemarketer for the Lottery Companies, Asiegbu telephoned elderly victims in the United States and informed them that they were winners of a foreign lottery.[2]  Victims were purportedly told that they had to send money to the Lottery Companies to claim their prizes, which money would be used to pre-pay taxes, attorneys' fees, and administrative fees on the winnings.[3]  Some victims were told that, if they paid a fee, the Lottery Companies could recover funds they had lost previously to other fraudulent telemarketers.[4] The government alleges that elderly victims of the scheme lost more than $2 million.[5]

## B.  The Circumstances Surrounding Asiegbu's Indictment and Transfer to U.S. Custody

At the time of the indictment, Asiegbu resided in Canada.[6]  In its opposition, the government explains the steps it must take to extradite a defendant from Canada.  First, the United States Attorney must send an extradition request to the Department of Justice's Office of International Affaris ("OIA"); an OIA attorney then determines whether the request meets the

---

[1]Government's Opposition to Motion by Defendant Natty Asiegbu to Dismiss Indictment for Violation of Defendant's Sixth Amendment Right to Speedy Trial ("Opp.") at 1-2.

[2]*Id.* at 2.

[3]*Id.*

[4]*Id.*

[5]*Id.* at 3.

[6]Motion to Dismiss Indictment for Violation of Defendants' Sixth Amendment Right to Speedy Trial ("Def.'s Mot.") at 3; Opp. at 3.

requirements of the United States' extradition treaty with Canada.[7] After finalizing the request, the OIA sends it to the Canadian Department of Justice, and "at the request of [the] OIA, the U.S. Department of State issues a separate diplomatic note requesting the extradition."[8] The Canadian Department of Justice's International Assistance Group ("IAG") reviews the request, and, if necessary, requests supplemental information.[9] The IAG then sends the request to the appropriate regional office of the Canadian Department of Justice for review.[10] If the request is satisfactory, an arrest warrant for the defendant is issued.[11] After the defendant is arrested, a Canadian extradition judge determines "whether the conduct in the foreign state would constitute an offense in Canada if it had occurred in Canada and if there is sufficient evidence to prosecute the fugitive."[12] Finally, "the Canadian Minister of Justice must make a decision whether the defendant should be surrendered to the requesting state in accordance with the relevant extradition treaty."[13]

The government sent a request for Asiegbu's extradition to the OIA in October 2002.[14] The OIA submitted the request to the IAG in November 2002, and the State Department issued a diplomatic note requesting Asiegbu's extradition on January 29, 2003. The note contained an unspecified error, and the State Department issued a new note on February 24, 2003.[15] On March

---

[7]Declaration of Jeffrey M. Olson ("Olson Decl."), ¶ 2(A)

[8]*Id.*

[9]*Id.*

[10]*Id.*

[11]*Id.*

[12]*Id.*, ¶ 2(B).

[13]*Id.*, ¶ 2(C). The decisions of the extradition judge and Minister of Justice are subject to appeal in the Canadian court system. (*Id.*, ¶ 2(D).)

[14]*Id.*, ¶ 3(A).

[15]*Id.*

10, 2003, the IAG requested supplemental information; the United States provided the requested information on April 23, 2003.[16]  The IAG requested additional supplemental information on January 21, 2004; the government provided this information on June 24, 2004.[17]  On December 21, 2004, the IAG informed the OIA that it had approved the request and forwarded it to the regional office of the Canadian Department of Justice in British Columbia.[18]  Canadian authorities arrested Asiegbu on May 12, 2005.[19]  Asiegbu contested his extradition in the Canadian courts.[20]  He was extradited in October 2008, and made his first court appearance on October 31, 2008.[21]  Trial was initially scheduled for December 16, 2008; it was continued to March 3, 2009 at Asiegbu's request.[22]

## II.  DISCUSSION

### A.   Legal Standard Governing Claims Of Post-Indictment Delay

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. CONST., AMEND. 6.  The court evaluates claims that a defendant's speedy trial rights have been violated by balancing four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.  *United States v. Mendoza*, 530 F.3d 758, 762 (9th Cir. 2008) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).  The speedy trial inquiry is a two-step process.  First, the court considers whether the

---

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]Opp. at 1.

[20]*Id.*

[21]*Id.*

[22]*Id.*

delay "passes a threshold point of 'presumptively prejudicial' delay." See *United States v. Beamon*, 992 F.2d 1009, 1012 (9th Cir. 1993) (citing *Doggett v. United States*, 505 U.S. 647, 652 (1992)).  Most courts generally find post-accusation delay presumptively prejudicial if it approaches one year. See *Doggett*, 505 U.S. at 652, n. 1.  The Ninth Circuit has held that even "a six-month delay constitutes a 'borderline case.'" *United States v. Lam*, 251 F.3d 852, 856 (9th Cir. 2001) (quoting *United States v. Valentine*, 783 F.2d 1413, 1417 (9th Cir. 1986)).

If the delay passes this threshold, "the court considers the extent to which the delay exceeds the threshold point in light of the degree of diligence by the government and acquiescence by the defendant to determine whether sufficient prejudice exists to warrant relief." *Beamon*, 992 F.2d at 1012 (citing *Doggett*, 505 U.S. at 650-56).  "'[N]one of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant.  In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process.'" *Lam*, 251 F.3d at 856 (quoting *Barker*, 407 U.S. at 533).

**B.    Whether the Nearly Three Year Delay Between Asiegbu's Indictment and His Arrest Violated His Sixth Amendment Right to a Speedy Trial**

**1.    Length of Delay**

Asiegbu seeks to dismiss the indictment on the basis of the nearly three year delay between his indictment on June 27, 2002 and his arrest on May 12, 2005.  While most post-indictment delay claims challenge the time lapse between indictment and *trial*, a defendant may also rely on delay between indictment and arrest. See *Doggett*, 505 U.S. at 652 ("the extraordinary 8½ year lag between Doggett's indictment and arrest clearly suffices to trigger the speedy trial enquiry"); *United States v. Aguirre*, 994 F.2d 1454, 1456 (9th Cir. 1993) (holding that a five year delay between indictment and arrest was "long enough to trigger a further look").  As the government concedes, a delay of nearly three years is clearly long enough to trigger a speedy trial inquiry.[23]

_____

[23]Opp. at 6.

5

1    See *Doggett*, 505 U.S. at 652, n. 1 (delay approaching one year is generally sufficient to trigger

2    inquiry).

3                              **2.      Reason for Delay**

4            The second factor the court must evaluate is "the reason the government assigns to justify

5    the delay." *Barker*, 407 U.S. at 531; see also *McNeely v. Blanas*, 336 F.3d 822, 827 (9th Cir.

6    2003) ("the prosecution bears the burden of explaining pretrial delays"). In *Barker*, the Court

7    explained that "different weights should be assigned to different reasons" for delay. *Barker*, 407

8    U.S. at 531. A "valid reason," such as a missing witness, will justify an appropriate delay. *Id*.

9    A "deliberate attempt" to delay a criminal defendant's trial, by contrast, should be "weighted

10   heavily against the government." *Id*. A "neutral reason" such as negligence or overcrowded

11   courts should be "weighted less heavily but nevertheless considered since the ultimate

12   responsibility for such circumstances must rest with the government rather than with the

13   defendant." *Id*.; see also *Gregory*, 322 F.3d at 1162 ("noting that "[t]he government's

14   negligence, which is the reason for the delay, weighs in Gregory's favor"); *Beamon*, 992 F.2d

15   at 1013 (accepting the district court's finding that "the government did not act with appropriate

16   diligence in pursuing [the defendants]").[24]

17          Delay due to extradition does not weigh against the government where the government

18   "move[s] with reasonable alacrity" in seeking extradition. See *United States v. Moore*, 652 F.2d

19   384, 388 (9th Cir. 1981) (rejecting defendant's speedy trial claim because the government

20   promptly sought the defendant's extradition and did not obtain trial advantages from delay); see

21   also 9A Federal Procedure, Lawyer's Edition § 22:1286 ("Ordinarily, the delays involved in

22   international extradition do not violate the speedy trial right. Absent evidence of any formal

23   waiver of extradition, courts are unwilling to attribute to the government any delay caused by

24   ────────────────────

25          [24]In similar fashion, if the reason for the delay rests with the defendant, the second factor
     must be weighed against him. *Lam*, 251 F.3d at 857 (holding that the second factor weighed
26   "heavily" against the defendant because "the reason for the delay . . . rested squarely on the
     shoulders of [the defendant's] court-appointed trial counsel"); see also *Aguirre*, 994 F.2d at 1457
27   (because the district court's conclusion that the government had diligently searched for the missing
28   defendant was not clearly erroneous, the second *Barker* factor weighed against the defendant).

formal extradition proceedings initiated in compliance with an extradition treaty," citing *Moore*, 653 F.2d at 388-89; *United States v. Thirion*, 813 F.2d 146, 154 (8th Cir. 1987); and *United States v. Sensi*, 664 F.Supp. 566 (D.D.C. 1987)).

Here, there is no indication that the government deliberately attempted to delay Asiegbu's trial, and little, if anything, to suggest that the government acted negligently. Four months elapsed between Asiegbu's indictment and the prosecutor's request to the OIA for Asiegbu's extradition. Although the government has not explained this delay, it does not appear unreasonable, and there is no evidence to suggest it was due to negligence on the part of the prosecutor. Next, a month passed before the OIA sent an official request for extradition. This delay was clearly reasonable. According to the declaration of OIA attorney Jeffrey Olsen, both an extradition request and a diplomatic letter from the State Department are necessary to trigger review by the Canadian government. An additional two months passed before the State Department sent the necessary letter in January. This, too, does not appear to be an unreasonable amount of time. The letter, however, contained an error, and a corrected letter was not sent to Canada until February. Thus, of the eight-month delay between Asiegbu's indictment and the start of Canada's review of the extradition request, at most one month, i.e., the month between the initial diplomatic letter and the corrected letter, is attributable to negligence by the government.

Thereafter, only the length of the time between Canada's requests for supplemental information and the responses to those requests was within the government's control. The government took one month to respond to the first request and five months to respond to the second. Although it is unclear why responding to the second request took significantly longer than responding to the first, the court cannot conclude, based on the record before it, that the government acted negligently. In his reply, Asiegbu argues that the fact that the Canadian authorities requested additional information is attributable to negligence by the government.[25] Nothing in the record suggests that the government could have prevented the supplemental

---

[25]Reply Memorandum in Support of Motion to Dismiss Indictment for Violation of Defendant's Sixth Amendment Right to Speedy Trial ("Reply") at 2-4.

requests by anticipating precisely what information Canada would require, however. Rather, Olsen's declaration suggests that a back and forth exchange involving requests for additional information is typical of the extradition process. He explains that after an extradition request is sent to Canada, the IAG "then reviews the request. . . and may request supplemental information or, in some cases, a new request, depending on the nature and complexity of the request and sometimes based on the legal requirements of the courts of the applicable Canadian province where the defendant is located."[26]

Overall, the court concludes that the government acted with reasonable diligence in seeking Asiegbu's extradition. The reason for the delay, i.e., the need to secure Asiegbu's extradition from Canada, thus does not weigh against the government. See *Moore*, 652 F.2d at 388; 9A Federal Procedure, Lawyer's Edition § 22:1286.

### 3.     Asiebu's Assertion of His Right to a Speedy Trial

Asiegbu asserts that he was not notified that an indictment had been filed against him until his arrest in February 2005. The government presents no evidence to the contrary. Asiegbu's failure to assert his speedy trial right prior to his arrest, therefore, does not weigh against him. See *Doggett*, 505 U.S. at 653-54 ("[T]he trial and appellate courts were entitled to accept the defense's unrebutted and largely substantiated claim of Doggett's ignorance [of the indictment]. Thus, Doggett is not to be taxed for invoking his speedy trial right only after his arrest"); *Beamon*, 992 F.2d at 1013 ("As to the third factor, the defendant's asserting his right to a speedy trial, the district court found that although [the defendants] knew the investigation was continuing, Beamon did not know about the indictment and McMillin turned himself in within a few weeks of finding out he was wanted by the police. Thus, neither can be faulted for contributing to the delay. The third factor, accordingly, favors Beamon and McMillin"); *United States v. Williams*, 782 F.2d 1462, 1465-66 (9th Cir. 1985) ("[T]he district court found that although there was some indication that Williams may have known that postal authorities were looking for him, there was no evidence, in fact, that Williams knew of the indictment. This factual finding is not clearly

---

[26]Olson Decl., ¶ 2(A).

8

1   erroneous.  Thus, the failure to assert his right to a speedy trial will not be weighed against

2   Williams").[27]

3           **4.      Whether Asiegbu Has Suffered Prejudice As A Result Of The Delay**

4                   **a.      Standards Governing Prejudice in the Speedy Trial Context**

5           A defendant typically must show he has suffered actual prejudice as a result of post-

6   indictment delay.   The amount of prejudice a defendant must show, however, is inversely

7   proportional to the length and reason for the delay.  "No showing of prejudice is required when

8   the delay is great and attributable to the government."  *United States v. Shell*, 974 F.2d 1035,

9   1036 (9th Cir. 1992) (citing *Doggett*, 505 U.S. at 655-56 (noting that "affirmative proof of

10  particularized prejudice is not essential to every speedy trial claim. . . .  [E]xcessive delay

11  presumptively compromises the reliability of a trial in ways that neither party can prove or, for

12  that matter, identify")).  If the government "has been negligent and the delay does not far exceed

13  the minimum time required to trigger the full *Barker* inquiry, [however,] '[the court] must

14  consider the amount of delay in relation to particularized prejudice.'"  *Gregory*, 322 F.3d at

15  1163, citing *Beamon*, 992 F.2d at 1014.  "In negligence cases. . . [the court's] concern for

16  substantiating prejudice diminishes as delay mounts."  *Beamon*, 992 F.2d at 1013.

17          Where a demonstration of particularized prejudice is required, it "can be shown in three

18  ways: oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility

19  that the accused's defense will be impaired."  *Id.* at 1014 (citing *Doggett*, 505 U.S. at 654).  The

20  Supreme Court has noted that impairment of an accused's defense is  "the most serious [of the

21  three grounds for prejudice] . . . because the inability of a defendant adequately to prepare his

22

23

24          [27]In *Beamon*, the Ninth Circuit held that the third factor "favor[ed]" defendants because
    they were unaware of the indictments pending against them.  It is perhaps more accurate to state,
25  however – as the same court did in *Williams*, 782 F.2d at 1465-66 – that the third factor does not
    weigh against a defendant who fails to assert his right to a speedy trial because he is ignorant that
26  an indictment has been returned against him.  In contrast, a defendant's prompt assertion of his
    speedy trial right weighs slightly in his favor.  See *Gregory*, 322 F.3d at 1162, n. 4 ("[W]e have
27  twice concluded that the prompt assertion of speedy trial rights weighs, at least slightly, in the
    defendant's favor").
28

case skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

In evaluating whether an accused's defense has been impaired by delay, a court examines "prejudice caused by the delay that triggered the *Barker* inquiry, not simply any prejudice that may have occurred before the trial date but [that is] unrelated to the fact of the delay itself." *Gregory*, 322 F.3d at 1163; see also *Barker*, 407 U.S. at 534 ("[T]here is no claim that any of Barker's witnesses died or otherwise became unavailable *owing to the delay*" (emphasis added)). The prejudice suffered must be concrete, not merely speculative. See *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986) (a "possibility of prejudice is not sufficient to support" a finding that speedy trial rights have been violated); *Gregory*, 322 F.3d at 1164 (defendant's claim that a higher sentence might be imposed upon conviction as a result of a delay did not satisfy the actual prejudice requirement because "any sentencing prejudice that Gregory might suffer is speculative rather than actual"); *Lam*, 251 F.3d at 860 ("Lam cannot credibly point to any specific damage to his defense stemming from the delay in his trial. . . . Lam's contentions regarding alleged defects in witness testimony or lost evidence amount at most to speculation and fail to demonstrate any actual prejudice to his defense"); *Beamon*, 992 F.2d at 1014 ("Beamon and McMillin argue that their defense was prejudiced because they had a better chance of negotiating a favorable resolution of the case before the time they were arrested. . . . Whether the prosecutor would have agreed to a lower sentence, or the court would have approved it, without the delay is speculation. For this reason, there is only the possibility of prejudice, and that is insufficient in the Sixth Amendment context").

### b.    Whether Asiegbu Must Show Particularized Prejudice

Asiegbu is not excused from demonstrating actual prejudice. At most one month of the delay between his indictment and arrest is attributable to an isolated instance of negligence in the government's otherwise diligent pursuit of Asiegbu, i.e. the error in the initial diplomatic letter. This is insufficient to obviate the need to show particularized prejudice. Cf. *Beamon*, 992 F.2d at 1014 (defendants were required to show actual prejudice where government's failure to pursue them with due diligence resulted in delays of seventeen and twenty months); compare *Doggett*, 505 U.S. at 657-58 (holding that an 8½ year lag between indictment and arrest, due largely to the

1   government's negligence, led to a "presumption of prejudice, albeit unspecified, [that] is neither

2   extenuated . . . nor persuasively rebutted").

3                    **c.    Whether Asiegbu Has Shown Sufficient Prejudice**

4            Asiegbu was not incarcerated during the period between his indictment and arrest; because

5   he was unaware of the indictment, he did not suffer anxiety and concern.   Thus, to show

6   prejudice, he must demonstrate that his ability to mount a defense was impaired.   Asiegbu does

7   not contend that he has lost access to witnesses or evidence as a result of the delay.   Rather, he

8   asserts that he was prejudiced because, during the period between his indictment and arrest, he

9   settled a civil case filed by the Federal Trade Commission ("FTC") against him that was based

10  on the same facts as this case.[28]   In the settlement, Asiegbu gave up his claim to three parcels of

11  real property that Wilson Okike and his family also claimed.[29]   Asiegbu had sued Okike, seeking

12  unpaid compensation from the telemarketing businesses, and filed a lis pendens against the

13  properties in connection with the suit.[30]   The settlement allowed the FTC to sell the properties to

14  compensate victims of the telemarketing fraud.   Asiegbu contends that had he been aware of the

15  indictment, he "would have recognized the need to conserve his resources to defend himself

16  against the criminal charges, and would not have surrendered his claim to the real property."[31]

17  He does not specify how access to the additional funds would have improved his defense.

18          Asiegbu has not shown concrete prejudice to his defense as a result of his loss of his claim

19  to the property.   Indeed, the prejudice he claims is speculative.   Without adducing evidence, he

20  asks the court to speculate that he would not have settled the FTC's lawsuit if he had known of

21  the indictment; that he would have prevailed in the suit; and that this would have benefitted his

22  defense.   Any potential prejudice arising from Asiegbu's loss of his claim to the properties,

23  _____

24      [28]Def.'s Mot. at 5.

25      [29]*Id.*   Okike, allegedly a participant in the telemarketing fraud, was identified in the
26  indictment as a "co-schemer."

27      [30]Opp. at 4.

28      [31]Def.'s Mot. at 5.

moreover, is not related to the delay.  Asiegbu might have lost the suit and his claim to the properties even had he been arrested shortly after his indictment.

At the hearing on the motion, Asiegbu argued that he was prejudiced by the settlement for a different reason.  Specifically, he pointed to a declaration the FTC obtained from him in connection with the settlement.  In the declaration, Asiegbu admitted to working for the lottery business and conceded that he knew the business's activities were illegal.[32]  The FTC submitted the declaration in support its motion for summary judgment against Okike.[33]  FTC attorney Eleanor Durham testified at the hearing that at the time the FTC obtained the declaration, she was aware that a criminal investigation of the lottery companies was ongoing.  She also testified that the primary purpose of the declaration was to confirm that Asiegbu had no assets which could be used to provide restitution for victims of the lottery scheme.  Durham testified that to her knowledge, the FTC did not inform Asiegbu of the criminal investigation.  Asiegbu asserted that, had the FTC informed him of the investigation, he would not have executed a potentially incriminating declaration in connection with the settlement.

As is evident from this description of Asiegbu's argument, the source of his claimed prejudice is not the prosecution's delay in securing his arrest following indictment, but the FTC's failure to advise him of the investigation.  Outside the speedy trial context, courts have addressed the propriety of parallel civil and criminal proceedings by different arms of the government. Generally, parallel civil and criminal proceedings examining the same conduct are permissible, and simultaneous progression of both proceedings is considered to be in the public interest.  See *United States v. Kordel*, 397 U.S. 1, 11 (1970) ("It would stultify enforcement of federal law to require a governmental agency . . . invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial").  For this reason, "[t]he prosecution may use evidence obtained in a civil proceeding in a subsequent criminal action unless the defendant shows that to do so would

---

[32]Declaration of Eleanor Durham ("Durham Decl."), Attachment B.

[33]*Id.*, ¶¶ 5-6.

12

violate his constitutional rights or depart from the proper administration of criminal justice."
*United States v. Unruh*, 855 F.2d 1363, 1374 (9th Cir. 1987) (citing *Kordel*, 397 U.S. at 12-13);
see also *Securities and Exchange Commission v. Dresser Industries, Inc.*, 628 F.2d 1368, 1377
(D.C. Cir. 1980) ("The SEC cannot always wait for Justice to complete the criminal proceedings
if it is to obtain the necessary prompt civil remedy; neither can Justice always await the conclusion
of the civil proceeding without endangering its criminal case.  Thus we should not block parallel
investigations by these agencies in the absence of 'special circumstances' in which the nature of
the proceedings demonstrably prejudices substantial rights of the investigated party or of the
government"); *United States v. Scrushy*, 366 F.Supp.2d 1134, 1139 (N.D. Ala. 2005) (the
"prosecution may use evidence from a civil action in a subsequent criminal proceeding unless it
would violate the defendant's constitutional rights 'or depart from the proper administration of
criminal justice,'" citing *United States v. Teyibo*, 877 F.Supp. 846, 855-56 (S.D.N.Y. 1995)).

In *Kordel*, the Supreme Court identified the type of circumstances that would support a
finding that a defendant's due process rights had been violated due to parallel criminal and civil
proceedings.  These included cases in which (1) the government pursued a civil action "solely to
obtain evidence for a criminal prosecution"; (2) the government "failed to advise the defendant
during the civil proceeding that it contemplate[d] his criminal prosecution"; (3) "the defendant
[wa]s without counsel"; (4) the defendant "reasonably fear[ed] prejudice from pretrial publicity
or other unfair injury"; or (5) "other special circumstances suggest that the criminal prosecution
is unconstitutional or improper." *Kordel*, 397 U.S. at 11-12; see also *Teyibo*, 877 F.Supp. at 846-
47 (analyzing the *Kordel* factors to determine whether the use of civil discovery in a criminal case
warranted suppression of evidence and dismissal of the indictment).

Of the circumstances identified in *Kordel*, only the government's "fail[ure] to advise the
defendant during the civil proceeding that it contemplate[d] his criminal prosecution" is applicable
to Asiegbu's situation on the present record.  The Ninth Circuit has recently clarified, however,
that suppression of evidence or dismissal of an indictment due the failure to disclose a concurrent
or possible criminal investigation is not appropriate absent evidence of "trickery or deliberate
misleading" by the government.  See *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir.

2008); see also *id.* at 940 ("A government official must not affirmatively mislead the subject of parallel civil and criminal investigations into believing that the investigation is exclusively civil in nature and will not lead to criminal charges.   However, we have consistently held that the failure of an IRS agent . . . to warn a taxpayer that an audit may have potential criminal ramifications does not render the search unreasonable. . . .   Almost every [ ] circuit has denied suppression, even when government agents did not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations. . . .   We applied virtually the same standard in *Robson*, where we held that suppression was not appropriate in the absence of affirmative misrepresentations.   [*United States v. Robson*] 477 F.2d [13,] 17-18 (9th Cir. 1973)" (other citations and internal quotation marks omitted)).

There is no evidence here that the SEC affirmatively mislead Asiegbu to believe that the lottery businesses were not the subject of the criminal investigation.   Thus, on the present record, the SEC's activities, on their own, would not support dismissal of the indictment on due process grounds.[34]

The question for the court, then, is whether the SEC's failure to notify Asiegbu of the criminal investigation before he participated in settlement of the civil action constitutes sufficient prejudice to support dismissal on speedy trial grounds, despite the fact that it would be insufficient to support dismissal on due process grounds.   The court concludes that it does not.   The Ninth Circuit in *Stringer* indicated that parallel civil and criminal proceedings are both permissible and desirable.   See 535 F.3d at 937 ("Effective enforcement of the securities laws requires that the SEC and [the Department of] Justice be able to investigate possible violations simultaneously," quoting *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1377 (D.C. Cir. 1980) (en banc)); see also *Kordel*, 397 U.S. at 11 (""It would stultify enforcement of federal law to require a governmental agency . . . invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief").   If otherwise permissible conduct in a civil case could lead

---

[34]The court's decision on Asiegbu's speedy trial claim is without prejudice to his right to seek suppression of the declaration on appropriate grounds.

1  to dismissal of a criminal prosecution on speedy trial grounds, this policy would be frustrated.

2  Agencies like the FTC might curtail civil proceedings out of concern that otherwise permissible

3  investigatory and litigation activity would later give rise to a claim of prejudice under the Speedy

4  Trial Act.

5          Moreover, any prejudice to Asiegbu's from his declaration was not "caused by the delay

6  that triggered the *Barker* inquiry," *Gregory*, 322 F.3d at 1163, but by the fact that the FTC did

7  not advise him of the criminal investigation.  Any "prejudice that may have occurred before the

8  trial date but [that is] unrelated to the fact of the delay itself" is not a factor in the speedy trial

9  analysis.  See *id*.  This is particularly true since appropriate remedies for abusive use of parallel

10  proceedings are available outside the speedy trial context.

11          Asiegbu's prejudice claim is further undermined by the fact that, in 2000, he stated in a

12  filing related to his claim against Okike that he was aware the actions of the lottery business in

13  which he participated were illegal.[35]  The fact that Asiegbu made this admission in 2000, before

14  the indictment was filed, undercuts his claim that he would not have made incriminating statements

15  in the SEC action but for the delay between his indictment and arrest.

16                          **5.    Balancing the Factors**

17          Although the nearly three year period that elapsed between Asiegbu's indictment and arrest

18  is sufficient to trigger a speedy trial analysis, the delay was necessary and has not concretely

19  prejudiced Asiegbu.  To secure Asiegbu's arrest, the government was required to engage in a

20  lengthy extradition process with Canadian authorities.  Aside from an error in a diplomatic letter

21  that delayed extradition by one month, there is no evidence that the government acted negligently.

22  The government initiated the extradition process soon after Asiegbu's indictment and acted

23  diligently while its extradition request was pending.  Asiegbu's failure to assert his speedy trial

24  rights during this period does not weigh against him, as he was unaware that he was under

25  indictment.  He has not demonstrated that the delay resulted in any actual impairment of his

26  defense, however.  Consequently, on balance, the court concludes that the delay between

27  ——————————

28          [35]See Durham Decl., Attachment A at 37.

                                    15

1  Asiegbu's indictment and arrest did not violate his speedy trial rights.  See *Williams*, 782 F.2d at

2  1465-66 (9th Cir. 1985) (39 month delay with no government negligence and minimal showing

3  of prejudice did not violate defendant's speedy trial rights).

4

5                                          **III.  CONCLUSION**

6          For the reasons stated, Asiegbu's motion to dismiss the indictment is denied.

7

8

9  DATED: February 17, 2009

10                                          MARGARET M. MORROW
                                            UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            16